## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE INSTITUTE FOR LAW, INNOVATION & TECHNOLOGY, TEMPLE UNIVERSITY, BEASLEY SCHOOL OF LAW, 1719 Broad Street Philadelphia, PA 19122; | ) ) ) ) ) ) ) |
| RED EN DEFENSA DE LOS DERECHOS DIGITALES, San Ramón 14. Col. Del Valle. Alcaldía Benito Juárez. Ciudad de México. México. 03100; | ) ) ) ) ) ) |
| and | ) ) |
| SURVEILLANCE RESISTANCE LAB 121 Avenue of the Americas, 6th floor New York, NY 10013 | ) ) ) ) |
| *Plaintiffs*, | ) ) ) |
| v. | ) ) |
| UNITED STATES DEPARTMENT OF STATE, The Executive Office Office of the Legal Adviser Suite 5.600 600 19th Street NW Washington, DC 20522; | ) ) ) ) ) ) ) ) |
| NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, 100 Bureau Drive Gaithersburg, MD 20899; | ) ) ) ) ) |
| UNITED STATES CUSTOMS AND BORDER PROTECTION, Office of Chief Counsel Suite 4.4-B 1300 Pennsylvania Avenue NW, Washington, DC 20229; | ) ) ) ) ) ) ) |

Civil Action No._____

**COMPLAINT**
(Freedom of Information Act)

UNITED STATES IMMIGRATION AND    )
CUSTOMS ENFORCEMENT,    )
Office of the Principal Legal Advisor,    )
500 12th St, SW    )
Mail Stop 5900    )
Washington, D.C. 20536;    )
    )
UNITED STATES DEPARTMENT OF    )
HOMELAND SECURITY,    )
Office of the General Counsel    )
245 Murray Lane, SW    )
Mail Stop 0485    )
Washington, DC 20528-0485;    )
    )
and    )
    )
UNITED STATES AGENCY FOR    )
INTERNATIONAL DEVELOPMENT,    )
1300 Pennsylvania Avenue, N.W.    )
Washington, D.C. 20523    )
    )
                    *Defendants.*    )

## PRELIMINARY STATEMENT

1.      Plaintiffs The Institute for Law, Innovation & Technology ("iLIT"), Red en Defensa de los Derechos Digitales ("R3D"), and Surveillance Resistance Lab ("SRL") (collectively, "Plaintiffs") bring this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking the disclosure of records held by United States government agencies concerning the use of technologies and infrastructure facilitating U.S. border enforcement and migration control. Plaintiffs request declaratory and other appropriate relief with respect to the government's unlawful withholding of these records.

2.      Now more than ever, the public has a vital interest in government transparency about the use of technology for U.S. border enforcement and immigration control. Immigration enforcement and border control has been one of the highest—if not the highest—priorities for the new Trump administration. Within the several weeks of President Trump's inauguration, the administration has taken swift and unprecedented action on immigration. On his first day in office alone, President Trump enacted ten Executive Orders related to immigration, at least three of which have already been challenged in federal court.[1] By February 4, 2025, deported migrants had been flown to Guantánamo Bay, where President Trump stated the U.S. will build a facility to hold up to 30,000 people.[2] Some of the individuals already sent to Guantánamo Bay include individuals

---

[1] American Immigration Council, *After Day One: A High-Level Analysis of Trump's First Executive Actions* (Feb. 11, 2025), https://www.americanimmigrationcouncil.org/research/after-day-one-high-level-analysis-trumps-first-executive-actions; Justin Jouvenal and Ann E. Marimow, *Tracking Trump's wins and losses in court cases over his executive orders*, Wash. Post (Feb. 20, 2025), https://www.washingtonpost.com/politics/2025/02/07/trump-lawsuits-executive-orders-actions-legal-challenges/.

[2] Sara Dorn, *Everything to Know About Trump's 'Mass Deportation' Plans: Pope Francis Slams Trump's Treatment of Migrants*, Forbes (Feb. 11, 2025), https://www.forbes.com/sites/saradorn/2025/02/11/everything-to-know-about-trumps-mass-deportation-plans-pope-francis-slams-trumps-treatment-of-migrants/.

who have never been arrested or convicted of violent offenses or other serious crimes.[3]

3.    Just a few days later, the Trump administration deported approximately 300 migrants to Panama, where they were locked in a hotel and later sent to a guarded camp in the jungle.[4] Only after outcry from humanitarian groups and a lawsuit filed with the Inter-American Court of Human Rights did the Panamanian government release the deportees.[5]

4.    On March 10, 2025, the Trump administration completely repurposed CBP One to become CBP Home, turning it from a tool for obtaining asylum to a tool for self-deportation.[6] CBP Home provides migrants the ability to notify the United States government of their intent to voluntarily depart the country.[7] This repurposing of CBP One raises serious data privacy concerns, as the app collected users' biometric data and other sensitive information, which could now be used by the Trump administration to track and punish those same users.[8] Additionally, there are concerns that Department of Homeland Security relied on the same Privacy Impact Assessment ("PIA") for CBP Home as it issued for CBP One, and thus has not complied with the requirements of the E-Government Act of 2002.

---

[3] Camillo Montoya-Galvez, *U.S. sending nonviolent, "low-risk" migrants to Guantanamo despite vow to detain "the worst" there*, CBS News (Feb. 12, 2025), https://www.cbsnews.com/news/guantanamo-bay-migrants-trump/.

[4] Genevieve Glatsky, Farnaz Fassihi, and Julie Turkewitz, *Migrants Deported to Panama Ask: "Where Am I Going to Go?"*, N.Y. Times (Mar. 23, 2025), https://www.nytimes.com/2025/03/23/world/americas/migrants-panama-trump-stranded.html.

[5] *Id.*; Farnaz Fassihi and Julie Turkewitz, *Lawsuit Against Panama Challenges Detention of Trump Deportees*, N.Y. Times (Mar. 1, 2025), https://www.nytimes.com/2025/03/01/world/americas/panama-migrants-us-lawsuit.html.

[6] *See* CBP, *CBP launches enhanced CBP Home mobile app with new Report Departure feature*, https://www.cbp.gov/newsroom/national-media-release/cbp-launches-enhanced-cbp-home-mobile-app-new-report-departure.

[7] *Id.*

[8] *See* Joel Rose and Sergio Martínez-Beltrán, *Migrants who entered the U.S. via CBP One app should leave 'immediately,' DHS says*, NPR (Apr. 8, 2025), https://www.npr.org/2025/04/08/g-s1-58984/cbp-one-app-migrants-dhs-border.

5.      On March 14, 2025, President Trump issued a proclamation invoking the Alien Enemies Act against members of Tren de Aragua, a Venezuelan gang.[9] The proclamation authorized the removal of all Venezuelan citizens age fourteen and older who are part of Tren de Aragua and are not United States citizens.[10] The next day, the Trump administration deported a group of migrants fitting this criteria through three separate flights to El Salvador, ignoring a federal judge's order prohibiting the deportation.[11]

6.      Immigration regulation and enforcement have innumerable impacts both within the U.S. and far outside of U.S. territorial borders. People arriving at the U.S.-Mexico border originate from a wide range of countries from the region and beyond. Many are migrating in response to economic collapse, omnipresent violence, grave human rights violations, and humanitarian crises—often these factors are multiple and compounded.

7.      In 2023, applications for asylum in the United States rose by 63 percent over the previous year, surmounting 800,000.[12] Apprehensions at the southern U.S. border reached 2.3 million in 2022, the highest number ever recorded.[13] The federal government's failure to enact comprehensive immigration reform legislation in the 21st century has resulted in the U.S. Government's failure to keep up with these unprecedented increases in migration. The impacts of

---

[9] Proclamation No. 10903, 90 Fed. Reg. 13033 (Mar. 20, 2025).

[10] *Id.*

[11] Luke Broadwater, Albert Sun, and Annie Correal, *A Judge Ordered Deportation Planes to Turn Around. The White House Didn't Listen*, N.Y. Times (Mar. 17, 2025), https://www.nytimes.com/2025/03/17/us/politics/timeline-trump-deportation-flights-el-salvador.html.

[12] Figures accurate as of November 2023. Eileen Sullivan, *Asylum in America: by the Numbers*, N.Y. Times (Nov. 21, 2023) (relying on data from CBP, U.S. Citizenship and Immigration Services, and the Transactional Records Access Clearinghouse (TRAC) at Syracuse University), https://www.nytimes.com/2023/11/21/us/politics/migrant-crisis-border-asylum.html.

[13] *Id.*

this failure cannot be overstated, particularly for individuals fleeing violence and human rights violations.

8.      Taken together, increases in migration, a lack of legislative reform, and the ever-increasing role of the executive branch in immigration and border control have resulted in the U.S. Government's increasing reliance on technologies to track and manage migration flows, including outside of U.S. territorial borders.[14] Such technologies include remote migration processing, migration surveillance, and mechanisms for collecting and processing biometric data.

9.      DHS has significantly expanded its use of biometric information and technology in the past decade. In the past several years, DHS has significantly expanded its efforts to share biometric data with international partners and require migrants to use new technologies to apply for asylum. In addition, DHS has expanded the collection of biometric data to include younger children and to capture an increased number of multimodal biometric markers.[15] The agency admits that it uses this biometric information to help determine if individuals "pose a risk to the United States" and to make asylum decisions.[16] DHS also shares and receives biometric

---

[14] *See, e.g.*, Jerod MacDonald-Evoy, *ICE director envisions Amazon-like mass deportation system: 'Prime, but with human beings,'* Mich. Advance (Apr. 9, 2025), https://michiganadvance.com/2025/04/09/ice-director-envisions-amazon-like-mass-deportation-system-prime-but-with-human-beings/; Paul Mozur, Adam Satariano, and Aaron Krolik, *This Company's Surveillance Tech Makes Immigrants 'Easy Pickings' for Trump*, N.Y. Times (Apr. 14, 2025), https://www.nytimes.com/2025/04/14/technology/trump-immigration-tech-geo-group.html (describing the private prison firm Geo Group's technology and its use in deportations).

[15] *See* DHS Secretary John F. Kelly, *Memorandum for Component Heads: DHS Biometrics Expansion for Improved Identification and Encounter Management*, May 24, 2017, https://www.dhs.gov/sites/default/files/2022-06/dhs_biometrics_expansion-508.pdf; Eileen Guo, *The US wants to use facial recognition to identify migrant children as they age*, MIT Technology Review (Aug. 14, 2024), https://www.technologyreview.com/2024/08/14/1096534/homeland-security-facial-recognition-immigration-border/.

[16] DHS Office of Biometric Identity Management (OBIM), *Exchanging Biometric Data: Why Share Biometric Data?*, last updated Apr. 2, 2025, https://www.dhs.gov/exchanging-biometric-data.

information with local and state law enforcement, the intelligence community, and external federal and international partners. The use of these technologies thus has far-reaching implications beyond the immigration context and beyond U.S. territorial borders—even if migrants may not understand this when providing the required biometric data.[17]

10.     The U.S. Government's increased reliance on technology has made the already-difficult process of obtaining asylum nearly impossible. On October 28, 2020, U.S. Customs and Borders Protection ("CBP") launched the CBP One[TM] Mobile Application ("CBP One") to allow (non-immigrant) travelers to access certain CBP services.[18] The application was originally developed for limited purposes, mainly for immigrants to access Form I-94 information and to schedule appointments to inspect perishable cargo.[19] Under the Biden administration's Circumvention of Lawful Pathways rule,[20] however, asylum seekers arriving at the U.S.-Mexico Border were essentially precluded from seeking asylum in the United States *unless* they successfully secured an appointment scheduled via CBP One.[21] CBP One replaced all other means to seek asylum at the border.

---

[17] *Id.*

[18] CBP, *CBP One[TM] Mobile Application*, https://www.cbp.gov/about/mobile-apps-directory/cbpone.

[19] American Immigration Council, *CBP One: An Overview* (June 2, 2023), https://www.americanimmigrationcouncil.org/research/cbp-one-overview.

[20] 88 Fed. Reg. 31,314 (May 16, 2023); *see also* DHS, *Fact Sheet: Circumvention of Lawful Pathways Final Rule* (May 2023), https://www.dhs.gov/news/2023/05/11/fact-sheet-circumvention-lawful-pathways-final-rule.

[21] Eillen Sullivan and Steve Fisher, *At the End of a Hard Journey, Migrants Face Another: Navigating Bureaucracy*, N.Y. Times (Mar. 10, 2023), https://www.nytimes.com/2023/03/10/us/politics/migrants-asylum-biden-mexico.html?searchResultPosition=53; Camilo Montoya-Galvez, *CBP One app becomes main portal to U.S. asylum system under Biden border strategy*, CBS News (Apr. 11, 2023), https://www.cbsnews.com/news/cbp-one-app-us-border-asylum-biden/.

11.    To request appointments through CBP One, users were required to provide biometric information (facial photographs),[22] which are stored in the Department of Homeland Security's biometric storage and processing system, IDENT/HART.[23] At the moment the information was submitted, CBP One collected real-time GPS location data of the user.[24] The expansion of the application for a new use—the actual processing of migrants at the U.S.-Mexico border—proved to frustrate the asylum process for many. Notably, immigrants seeking asylum often lack reliable access to both a cell phone with the CBP One application and a strong enough internet signal to use the app.[25] Further, individuals with dark skin tones reported that the app was unable to register their photographs, making it impossible to obtain an appointment with CBP and work towards asylum.[26]

---

[22] *See* DHS, *Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* 8 (2023), https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp076-advance-collection-for-undocumented-individuals-jan2023_0.pdf; DHS, *Privacy Impact Assessment for CBP OneTM* 4 (2021), https://web.archive.org/web/20230720074901/https://www.dhs.gov/sites/default/files/2023-05/privacy-pia-cbp068-cbpmobileapplication-may2023.pdf.

[23] DHS, *Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* 22 (2023), https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp076-advance-collection-for-undocumented-individuals-jan2023_0.pdf.

[24] *See* DHS, *Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* 22 (2023), https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp076-advance-collection-for-undocumented-individuals-jan2023_0.pdf ("At the time the user submits their advance arrival information, the device's GPS is pinged by CBP One™, and the latitude and longitude coordinates are sent to CBP"); DHS, *Privacy Impact Assessment for CBP OneTM* 10 (2021), https://web.archive.org/web/20230720074901/https://www.dhs.gov/sites/default/files/2023-05/privacy-pia-cbp068-cbpmobileapplication-may2023.pdf.

[25] Melissa del Bosque, *Facial recognition bias frustrates Black asylum applicants to US, advocates say*, The Guardian (Feb. 8, 2023), https://www.theguardian.com/us-news/2023/feb/08/us-immigration-cbp-one-app-facial-recognition-bias.

[26] *Id.*

12.     Effective January 20, 2025, CBP completely shut off access to the CBP One mobile application and cancelled all existing appointments scheduled through CBP One.[27] In light of the Trump administration's repurposing of CBP One into CBP Home, it is unclear if or when CBP One will be made available again. Additionally, as mentioned above, the announcement of CBP Home has generated concern and uncertainty regarding the continued use of data collected through CBP One, especially considering Biden-era rules are now rescinded or otherwise inoperative.

13.     The federal government has also expanded its use of remote mobility technologies in the past several years. On May 10, 2023, the U.S. Department of State announced the Safe Mobility Initiative (MovilidadSegura.org) and Safe Mobility Offices ("SMOs"), described as an effort to expand "lawful pathways to the United States for refugees and migrants in South and Central America."[28] Like CBP One, the Safe Mobility Initiative and SMOs were publicly announced alongside the rollout of the Circumvention of Lawful Pathways rule, which drastically

---

[27] CBP, *CBP One$^{TM}$ Mobile Application*,
https://web.archive.org/web/20250120205102/https://www.cbp.gov/about/mobile-apps-directory/cbpone (last visited Jan. 20, 2025).

[28] *See* DHS, *Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023), https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration; U.S. Dept. of State, *Department of State and Department of Homeland Security Announce Additional Sweeping Measures to Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), https://web.archive.org/web/20230511143600/https://www.state.gov/department-of-state-and-department-of-homeland-security-announce-additional-sweeping-measures-to-humanely-manage-border-through-deterrence-enforcement-and-diplomacy/; Movilidad Segura platform, *General information on the 'Safe Mobility' initiative* https://web.archive.org/web/20230512140923/https://movilidadsegura.org/en/ (last visited Jan. 19, 2025).

curtailed access to asylum through the southern U.S. border.[29] President Trump has deactivated the Safe Mobility Initiative.[30] The initiative's future in the United States is unclear.

14.    When it was active, the SMO program had four partner countries in Central America—Guatemala, Ecuador, Costa Rica, and Colombia—and other participating countries accepting refugees for resettlement, including Canada, New Zealand, and Spain.[31] Two UN agencies, the Office of the U.N. High Commissioner for Refugees ("UNHCR") and the International Organization for Migration ("IOM"), were also formally involved in the initiative. UNHCR and IOM conducted biometric and biographic records checks of DHS information using the CBP One app and operated the primary SMO application portal (MovilidadSegura.org).[32]

15.    There is little information as to how biometric information collected through SMO centers was shared and used, how and when it was shared with international organizations and/or other participating countries, and how this data was securely managed and governed both in transit

---

[29] *See, e.g.*, pending legal challenges to the Final Rule and use of CBP One: *Al Otro Lado, Inc. v. Mayorkas* No. 23-cv-1367 (S.D. Cal. 2023); *East Bay Sanctuary Covenant v. Biden*, No. 18-cv-6810 (N.D. Cal. 2018).

[30] Movilidad Segura Platform Home page, https://movilidadsegura.org/en/ (last visited May 8, 2025); *see also, e.g.*, Camilo Montoya-Galvez, *Trump officials closing immigration offices Biden set up in Latin America*, CBS News (Jan. 23, 2025), https://www.cbsnews.com/news/trump-officials-closing-immigration-offices-biden-set-up-latin-america/.

[31] *See* U.S. Dept. of State Web Archive, *Safe Mobility Initiative: Helping Those in Need and Reducing Irregular Migration in the Americas*, https://2021-2025.state.gov/bureau-of-population-refugees-and-migration/safe-mobility-initiative-helping-those-in-need-and-reducing-irregular-migration-in-the-americas.

[32] DHS, *Privacy Impact Assessment for the United Nations High Commissioner for Refugees Information Data Share*, (Aug. 13, 2019), https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis081-unhcr-august2019.pdf; DHS, *CBP OneTM Mobile Application (DHS/CBP/PIA-068)* (Feb. 19, 2021), https://www.dhs.gov/publication/dhscbppia-068-cbp-one-mobile-application (file 'privacy-pia-cbp070-mpp-may2021.pdf).

and while at rest in these systems. This lack of information raises grave concerns about whether this data could be used for harmful purposes.[33]

16.    Under the Biden administration, ICE was reportedly undertaking an effort to "modernize documentation provided to some noncitizens," although details concerning the project were never released to the public.[34] The fiscal year 2023 appropriations bill included a $10 million budget for an ICE Secure Docket Card program.[35] In September 2023, ICE reportedly issued a pilot notification to Congress regarding the program,[36] and in May 2024, *Fox News* reported that the agency planned to issue 10,000 cards at pilot sites over the summer.[37] Reportedly, the card would have contained a photo and biographic identifiers, similar to a photo ID, while also permitting individuals to update and check in with federal authorities.[38]

---

[33] For example, in March 2025, the Trump administration and the Colombian Ministry of Foreign Affairs publicly signed a letter of intent to launch a biometric data exchange program for the purposes of combatting organized crime, trafficking and migration and drug interdiction and enforcement activities. No information has been shared publicly concerning the use of SMO data within the scope of this cooperation agreement. *See* Ministry of Foreign Affairs of Colombia (Cancillería), *Migración, seguridad, comercio y lucha contra las drogas: temas del encuentro de la Canciller Laura Sarabia y la Secretaria de Seguridad Nacional de los Estados Unidos, Kristi Noem* (Mar. 27, 2025), https://www.cancilleria.gov.co/newsroom/news/migracion-seguridad-comercio-lucha-drogas-temas-encuentro-canciller-laura-sarabia.

[34] *See* Adam Shaw, *Leaked images show Biden admin's planned ICE ID card for illegal immigrants*, Fox News (Sept. 21, 2023), https://www.foxnews.com/politics/leaked-images-show-biden-admins-planned-ice-id-card-illegal-immigrants (quoting an ICE spokesperson's statement on the program).

[35] *See* Department of Homeland Security Appropriations Bill, 2023, , H.R. 117-396, 117th Cong., p. 33 (Jul. 1, 2022), https://www.congress.gov/117/crpt/hrpt396/CRPT-117hrpt396.pdf.

[36] *See* Adam Shaw, *Leaked images show Biden admin's planned ICE ID card for illegal immigrants*, Fox News (Sept. 21, 2023), https://www.foxnews.com/politics/leaked-images-show-biden-admins-planned-ice-id-card-illegal-immigrants.

[37] *See* Adam Shaw, *Taxpayer-funded ID program for illegal immigrants expected to begin this summer*, Fox News (May 9, 2024), https://www.foxnews.com/politics/ice-eyes-summer-rollout-for-id-card-program-for-illegal-immigrants.

[38] Priscilla Alvarez, *ICE is developing new ID card for migrants amid growing arrivals at the border*, CNN (July 22, 2022), https://www.cnn.com/2022/07/22/politics/ice-immigrants-id-card-migrants-border/index.html.

17.    There is a significant gap in the public information available about these biometric-based technologies and related migration initiatives, which is highly concerning considering the severity of the risks and issues they raise.

18.    For instance, the American public currently has very little information regarding the rate of inaccurate biometric matches and how those inaccurate matches are mitigated in practice (if at all); how public funds are used to procure technical capacity and IT services to support biometric-based data sharing between the U.S. and other governments; and the operationalization of the biometric-based data sharing programs. The public is unaware of the extent and accuracy of biometric, biographical, and criminal history information-sharing occurring between the U.S. and foreign governments and how the U.S. is using this information to make legal and political decisions concerning access to asylum, relief from removal, and deportation to third countries.

19.    Another issue is algorithmic bias in these technologies. The problem of heightened false biometric match rates by race, age, and gender is widely documented. Yet limited public information exists on whether U.S. migration technologies suffer from these biases and, if so, to what extent.

20.    The new technologies and the lack of public transparency surrounding their procurement, installation, operation and use also raise major human rights concerns. Based on the current available information, the public cannot ascertain whether data collected by foreign partners is reliable. Data that is shared and used by federal and state governments to make life-changing immigration decisions should be held to the highest standard of accuracy, yet the public has no way of determining whether and how the U.S. Government is even assessing data reliability.

21.    Understanding these risks is vital. A false biometric-based identification match caused by unreliable data or algorithmic biases could place individuals at heightened risk of denial

10

of protection, extrajudicial killings and disappearances, unlawful detention, and refoulement (i.e., requiring someone to return to a country where they could face harm or persecution) when biometric data is used to make immigration decisions, or if biometric data is shared or stolen in a way that results in harm to individuals. The potential inaccuracy of biographical information contained in foreign and U.S. records likewise poses grave risks as physical markings or other alleged ties to criminal organizations increasingly determine not only access to protective immigration status in the U.S. but also potentially devastating decisions regarding deportation to and shockingly inhumane treatment in third countries such as El Salvador and Venezuela.

22.     Even after the Trump Administration ended the CBP One app (now relaunched as CBP Home) and the Safe Mobility Initiative, it is critical for the public to understand how the U.S. Government is and has been employing new and increasingly more sophisticated technologies for the collection and use of biometric data in effectuating its immigration policy goals. This information is essential for academics, journalists, policy advocates, and all citizens to study, write about, and petition their government regarding these practices. The lack of public information about these systems only compounds these concerns by frustrating the ability of Plaintiffs to study and report on the civil and human rights issues raised by the U.S. Government's use of these technologies.

23.     To better understand and clarify to the public the U.S. Government's activities and policies on the use of technology for the sharing of biometric data with and between foreign governments and the potentially significant consequences, Plaintiffs have sought comprehensive records relating to the U.S. Government's biometric data sharing infrastructure, biometric data sharing agreements, the Safe Mobility Initiative and Safe Mobility Offices, CBP One, and the Secure Docket Card Program.

11

24.     Obtaining this information is paramount to understanding and addressing the significant human rights concerns posed by the technologies used for border control both within the United States and beyond U.S. borders. Without this information, the public is left in the dark about how these programs were developed, their legacy uses and implications, whether the U.S. Government is analyzing the unreliability or bias of its biometric data sharing infrastructure, and how these technologies may directly impact an individual's ability to obtain asylum in the United States. Biometric-based identification and information-sharing have become an enormous part of how the U.S. Government makes decisions about immigration, deportation (including deportation to third countries), detention, asylum, withholding of removal, and cancellation of removal. As a result, transparency on these technologies is key to ensuring the government protects the right of asylum and is held accountable for any failures to protect that right.

25.     On September 9, 2024, Plaintiffs filed a FOIA Request (the "Request") with the U.S. Department of State ("DOS"), the National Institute of Standards and Technology ("NIST"), U.S. Customs and Border Protection ("CBP"), U.S. Immigration and Customs Enforcement ("ICE"), the Department of Homeland Security ("DHS"), and the U.S. Agency for International Development ("USAID").

26.     As of this filing, Defendants (defined below) have failed to comply with their obligations under the FOIA and produce the documents sought in the Request. Plaintiffs are legally entitled to receive the documents, and the public is entitled to the information contained therein regarding the United States government's activities with respect to biometric data sharing.

27.     As a result, Plaintiffs seek a declaration that they are entitled to receive the documents sought in the Request and an injunction ordering Defendants to respond to Plaintiffs'

Request, conduct a thorough search for all responsive records, and provide the requested documents.

## JURISDICTION AND VENUE

28.    This Court has federal subject matter jurisdiction over this action and personal jurisdiction over all parties pursuant to 5 U.S.C. § 552(a)(4)(B). Because this action arises under the FOIA against agencies of the United States, this Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346.

29.    Venue is proper in this District pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e), because the FOIA request was made to Defendants headquartered in this District and, upon information and belief, Defendants maintain records and information subject to the Request in this District.

## STATUTORY BACKGROUND

30.    Enacted in 1966, the Freedom of Information Act "provides that any person has a right, enforceable in court, to obtain access to federal agency records."[39] The "basic purpose of [the] FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."[40] The "FOIA is often explained as a means for citizens to know 'what their Government is up to.'"[41] "The Supreme Court stressed that '[t]his phrase should not be dismissed as a convenient formalism.' Rather, it 'defines a structural necessity in a real democracy.'"[42]

---

[39] U.S. Dep't of Justice, *About FOIA* (Oct. 30, 2018), https://www.justice.gov/archives/open/foia.
[40] *Id.* (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)).
[41] *Id.* (quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171 (2004) (citation omitted)).
[42] *Id.* (quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171-72 (2004) (citation omitted)).

31.     Under the FOIA, upon receipt of a FOIA request, an agency must determine within 20 business days—or, in "unusual circumstances," within 30 business days—whether it will comply with a request and notify the requestor of its determination and reasoning in writing.[43] This determination must also timely indicate the scope of the documents the agency intends to produce and the exemptions, if any, that it asserts will entitle it to withhold documents.

32.     In response to a FOIA request, an agency, after engaging in a reasonable search for responsive records, including any field offices that may possess relevant materials, must disclose in a timely manner all records that do not fall within nine narrowly construed statutory exemptions.[44]

33.     Typically, a requester under the FOIA must appeal agency action administratively before commencing litigation. However, if the agency has failed to abide by its obligations and issue a determination on the request or a determination on an administrative appeal within the statutory timeframe, the administrative appeal process is considered exhausted.[45]

34.     Upon complaint, a district court can enjoin an agency from withholding records and order production of records improperly withheld.[46]

**PARTIES**

35.     Plaintiff The Institute for Law, Innovation & Technology (iLIT) is an academic and policy center of Temple University – Of The Commonwealth System of Higher Education ("Temple"), a state-related, tax-exempt institution of higher learning, with the goal of illuminating and addressing the root causes of inequity and threats to human rights stemming from technological innovation.

---

[43] 5 U.S.C. § 552(a)(6)(A)(i)-(B)(i).
[44] *Id.* at § 552(a)(3)(A), (C), (b)(1)-(9).
[45] *Id.* at § 552(a)(6)(C)(i).
[46] *Id.* at § 552(a)(4)(B).

36.    Plaintiff Red en Defensa de los Derechos Digitales ("R3D") is a Mexican non-profit organization that uses legal and communication tools to defend human rights in the digital environment.

37.    Plaintiff Surveillance Resistance Lab ("SRL") is a non-profit fiscally sponsored project of the Fund for the City of New York that undertakes and disseminates investigative research on technology and society to communities, workers and advocates to build power toward a vibrant democracy.

38.    Defendant DOS is the United States agency responsible for the U.S. Government's foreign policy and relations. It is a direct recipient of the Request. DOS, together with DHS, developed and operates the Safe Mobility Initiative and Safe Mobility Offices ("SMOs"), which were described as an effort to expand "lawful pathways to the United States for refugees and migrants in South and Central America."[47] Biometric information was, until recently, collected through SMO centers. Upon information and belief, DOS has possession of and control over documents and information requested by Plaintiffs and is an agency within the meaning of 5 U.S.C. § 552(f).

39.    Defendant NIST is the United States agency responsible for promoting measurement science, standards, and technology to enhance productivity, facilitate trade, and

---

[47] *See* DHS, *Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023), https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration; U.S. Dept. of State, *Department of State and Department of Homeland Security Announce Additional Sweeping Measures to Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), https://web.archive.org/web/20230511143600/https://www.state.gov/department-of-state-and-department-of-homeland-security-announce-additional-sweeping-measures-to-humanely-manage-border-through-deterrence-enforcement-and-diplomacy/; Movilidad Segura platform, *General information on the 'Safe Mobility' initiative*, https://web.archive.org/web/20230512140923/https://movilidadsegura.org/en/ (last visited Jan. 19, 2025).

improve the quality of life. It is a component of the Department of Commerce and a direct recipient of the Request. In 2022, NIST entered an interagency agreement with DHS OBIM to increase the accuracy of OBIM's biometric matching.[48] Upon information and belief, NIST has possession of and control over documents and information requested by Plaintiffs and is an agency within the meaning of 5 U.S.C. § 552(f).

40.    Defendant CBP is the United States agency responsible for border management and control. It is a direct recipient of the Request. CBP developed and until recently operated the CBP One Mobile Application, which is virtually the only means to lodge a request for asylum at the U.S.-Mexico Border.[49] Upon information and belief, CBP has possession of and control over documents and information requested by Plaintiffs and is an agency within the meaning of 5 U.S.C. § 552(f).

41.    Defendant ICE, a component of Defendant DHS, is the United States agency responsible for enforcing immigration laws. It is a direct recipient of the Request. During the Biden administration, ICE was reportedly developing a Secure Docket Card ("SDC") program to "modernize documentation provided to some noncitizens."[50] Upon information and belief, ICE has

---

[48] See DHS, *OBIM-NIST Data Transfer,* DHS/OBIM/PIA-005 (May 16, 2022), dhs.gov/publication/dhsobimpia-005-office-biometric-identity-management-obim-national-institute-standards.

[49] Eillen Sullivan and Steve Fisher, *At the End of a Hard Journey, Migrants Face Another: Navigating Bureaucracy*, N.Y. Times, (Mar. 10, 2023), https://www.nytimes.com/2023/03/10/us/politics/migrants-asylum-biden-mexico.html?searchResultPosition=53; Camilo Montoya-Galvez, *CBP One app becomes main portal to U.S. asylum system under Biden border strategy*, CBS News (Apr. 11, 2023), https://www.cbsnews.com/news/cbp-one-app-us-border-asylum-biden/.

[50] See Adam Shaw, *Leaked images show Biden admin's planned ICE ID card for illegal immigrants*, Fox News (Sept. 21, 2023), https://www.foxnews.com/politics/leaked-images-show-biden-admins-planned-ice-id-card-illegal-immigrants (quoting an ICE spokesperson's statement on the program).

possession of and control over documents and information requested by Plaintiffs and is an agency within the meaning of 5 U.S.C. § 552(f).

42.    Defendant DHS is also responsible for enforcing federal immigration laws. It is a direct recipient of the Request. DHS uses biometric information to facilitate identification of individuals and determine if individuals pose a risk to the United States.[51] DHS shares biometric information with local and state law enforcement, "the intelligence community, and external federal and international partners."[52] Upon information and belief, DHS has possession of and control over documents and information requested by Plaintiffs and is an agency within the meaning of 5 U.S.C. § 552(f).

43.    Defendant USAID is the United States agency responsible for international development and international humanitarian assistance efforts. It is a direct recipient of the Request. USAID provided funding that was used for a project to provide capabilities for Government of Mexico agencies to store, match, and share biometric information to disrupt transnational organized crimes.[53] Upon information and belief, USAID has possession of and control over documents and information requested by Plaintiffs and is an agency within the meaning of 5 U.S.C. § 552(f).

---

[51] DHS Office of Biometric Identity Management (OBIM), *Exchanging Biometric Data: Why Share Biometric Data?*, last updated Apr. 2, 2024, https://www.dhs.gov/exchanging-biometric-data.
[52] *Id.*
[53] U.S. Gov't Acct. Off. (GAO) Rep. GAO-19-647, *U.S. Assistance to Mexico: State and US AID Allocated over $700 Million to Support Criminal Justice, Border Security, and Related Efforts from Fiscal Year 2014 through 2018*, 2019.

## FACTUAL BACKGROUND

**A.    The Federal Government's Use of Biometric Data in Connection with Migration Management Is a Matter of Significant Public Interest.**

44.    Immigration regulation and enforcement has been one of the highest and most immediate priorities for the new administration under President Donald Trump. On his first day in office, President Trump issued ten executive orders and proclamations related to immigration law and policy.[54] As of the date of this Complaint, President Trump has issued a total of seventeen immigration-related executive orders.[55]

45.    The need for information is urgent. President Trump has attempted to dismantle USAID, one of the agencies subject to the Request, and has not complied with court orders requiring the administration to reinstate USAID employees.[56] It is unclear whether any employees of USAID are now even able to respond to the Request and less likely that they will be able to as time passes, especially in light of USAID employees being directed in the past month to destroy records.[57] The administration has also completely shut down access to the CBP One Mobile

---

[54] American Immigration Council, *After Day One: A High-Level Analysis of Trump's First Executive Actions* (Jan. 22, 2025), https://www.americanimmigrationcouncil.org/research/after-day-one-high-level-analysis-trumps-first-executive-actions.
[55] Akin Gump, *Trump Executive Order Tracker: Immigration*, https://www.akingump.com/en/insights/blogs/trump-executive-order-tracker?bc=1107412&f=9 (last visited May 8, 2025).
[56] Plaintiffs' Notice of Defendants' Non-Compliance with Court Order and Emergency Motion for Show Cause Hearing, *Am, Foreign Serv. Ass'n v. Donald Trump*, Case No. 1:25-cv-00352 (D.D.C. Feb. 20, 2025).
[57] Edward Wong, *U.S.A.I.D. Official Orders Employees to Shred or Burn Classified and Personnel Records*, N.Y. Times (Mar. 11, 2025), https://www.nytimes.com/2025/03/11/us/politics/usaid-shred-burn-documents.html.

Application,[58] then announced its reinstatement as a self-deportation application, CBP Home,[59] and deactivated the Safe Mobility Initiative,[60] two of the programs that are the primary subjects of the Request. Public access to information about how the U.S. Government has used biometric information in connection with migration control, including information about CBP One, the Safe Mobility Initiative and SMOs, and the Safe Docket Program, is more important than ever.

46.     Importantly, it is unclear how the administration may use biometric and biographical data collected domestically or share it transnationally. Obtaining the records identified in the Request would tremendously help the public to understand how the U.S. and transnational actors could access or use biometric data and associated biographical records as well as any potentially harmful implications of that use and access.

47.     Currently, the public has limited data on adverse human impacts and risks of the U.S. Government's transnational data sharing to manage migration and the consequent expansion of biometric-based data sharing infrastructure. Researchers, members of the press, and immigration practitioners have raised numerous concerns over the adverse human impacts and risks of the U.S. Government's reliance on transnational data sharing to manage migration and the consequent expansion of biometric-based data sharing infrastructure. These concerns include the unreliability of data collected by foreign law enforcement authorities and algorithmic bias causing

---

[58] Jasper Ward, *Trump proposes fines, prison for migrants illegally in US who don't register*, Reuters (Feb. 26, 2025), https://www.reuters.com/world/us/trump-proposes-fines-prison-migrants-illegally-us-who-dont-register-2025-02-25/.

[59] 90 Fed. Reg. 12,752, 12,754 n.14 (Mar. 19, 2025); Ted Hesson, *Trump Administration Launches New "Self-Deportation" App*, Reuters (Mar. 10, 2025), https://www.reuters.com/world/us/trump-administration-launches-new-self-deportation-app-2025-03-10/; CBP, *CBP Home*, https://www.cbp.gov/sites/default/files/2025-03/cbp_home_sitd_qrg_march_2025.pdf (last visited May 8, 2025); CBP, *CBP Home Mobile Application*, https://www.cbp.gov/about/mobile-apps-directory/cbphome (last visited May 8, 2025).

[60] Movilidad Segura Platform Home page, https://movilidadsegura.org/en/ (last visited May 8, 2025).

inaccurate biometric matches or criminal history determinations, with both factors placing individuals at risk of denial of protection, extrajudicial killings and disappearances, unlawful detention, and refoulement. The problem of heightened false biometric match rates by race, age, and gender is widely documented, and yet little public information exists explaining how these risks are manifesting and mitigated in practice under the relevant programs. The potential inaccuracy of biographical information and human or algorithmic decision making based on these data can lead to disastrous actions, including improper deportation, unlawful detention, and refoulement. The consequences of the U.S. Government's use or misuse of biometric and biographical data or other surveillance technology can be life-changing and potentially deadly.

**B.    Plaintiffs' FOIA Request**

48.    Plaintiffs submitted the Request to DOS, NIST, CBP, ICE, DHS, and USAID on September 9, 2024. *See* **Exhibit A**.

49.    The Request seeks records regarding the use and sharing of biometric data in connection with enforcement of the U.S. Government's immigration laws and policies. The Request seeks information regarding specific contracts and programs related to such biometric data, including CBP One, the Safe Mobility Initiative and SMOs, and the Secure Docket Program. *See id.*

**1.    Full Records Requested**

50.    Regarding biometric data sharing infrastructure, the Request seeks:

a.    Copies of all documentation (i.e., requests for proposals, bidding documents, contracts, statements/scopes of work, performance work statements, award justification, MOUs, modifications to the contract, correspondence with contractors, correspondence with foreign government agencies concerning the

proposed services, proof of delivery, actor relationship diagrams, use case models, software models, framework class diagrams, framework sequence diagrams, component diagrams, deployment diagrams, entity relationship diagram, data dictionaries, functional and technical overviews, enterprise applications architecture and architecture standards, design artifacts such as storyboards, risk management plans, and/or procurement libraries) for the following contracts funded by the Bureau of International Narcotics and Law Enforcement Affairs (INL), of the US Department of State:

    i.   191NLE18R0001 (purchase order/solicitation)

   ii.   191NLE22P0043 (purchase order)

  iii.   19AQMM18C0231 (including subcontracts AASS-C-24024-001, AASS-C-24024-002, AES-D-26022-001, and 24MEX00008)

  iv.   19AQMM18D0038 (delivery orders 19AQMM21F0252, 19AQMM20F2163, 19AQMM19F2020, 19AQMM19F0827, 19AQMM18F0846, 19AQMM20F0043, 19AQMM18F1338, 19AQMM18F3890; as well as subcontracts 27MEX00014, 27MEX00006-CO3, 27MEX00008-CO5, 27MEX00013-CO2, 27MEX00008-CO4)

   v.   19AQMM20D0010-19AQMM22F2444 (including subcontract 26HAL00067)

  vi.   19AQMM20D0010-19AQMM23F1778 (including subcontract 26HAL00113)

      vii.   19AQMM20D0010-19AQMR23F5006 (including subcontracts AES-D-26022-001-26HAL00108-CO-0, 26HAL00103, 26HAL00105, 26HAL00107)

     viii.   19AQMM20D0015-19AQMM21F4198 (delivery order) (including subcontract SUB357781-01)

      ix.   GS00Q09BGD0025-19AQMM18F2277 (delivery order)

       x.   GS00Q09BGD0025-SAQMMA17F2623 (delivery order)

      xi.   SAQMMA17C0183 (definitive contract)

     xii.   SWHARC17M0001 (including subcontracts CA-06062017, AASS-C-24013-002). *See id.* at 9-11.

b. All correspondence (including attachments) with DHS, DOD or other government agencies regarding the funding, procuring, or assistance for building foreign partner capacity and establishing interoperability between DHS and the foreign government under the International Biometric Information Sharing Program (IBIS) and Biometrics Data Sharing Program (BDSP). *See id.* at 11.

c. All correspondence (including attachments) sent or received by staff at the Bureau of International Narcotics and Law Enforcement Affairs (INL) or staff at U.S. Embassy in Mexico City referencing "Digitus," since January 1, 2020. *See id.*

d. All records (correspondence, inventory lists, agreements, etc.) held by the Bureau of International Narcotics and Law Enforcement Affairs (INL) or staff at U.S. Embassy in Mexico City regarding the donation of software or

hardware to the Mexican Secretariat of Security and Civilian Protection (SSPC in Spanish) between November 1, 2022, and March 1, 2023. *See id.*

e.  Copies of all documentation (i.e., requests for proposals, bidding documents, contracts, statements/scopes of work, performance work statements, award justification, MOUs, modifications to the contract, correspondence with contractors, correspondence with foreign government agencies concerning the proposed services, proof of delivery, actor relationship diagrams, use case models, software models, framework class diagrams, framework sequence diagrams, component diagrams, deployment diagrams, entity relationship diagrams, data dictionaries, functional and technical overviews, enterprise applications architecture and architecture standards, design artifacts such as storyboards, risk management plans, and/or procurement libraries) for the following contracts awarded by the USAID/U.S. Mission to Honduras:

    i.  AIDOAAI1300033-AID522TO1600007 (including subcontract PUR-TEG-22-0149). *See id.*

f.  Correspondence (including attachments), meeting notes, memos and documents received or developed by NIST staff related to the development of Automated Real-time Identity Exchange System (ARIES), International Biometric Information Sharing Program (IBIS) and/or automated biometrics data-sharing partnerships (BDSPs). *See id.* at 12.

51.  Regarding biometric data sharing agreements and Safe Mobility Offices, the Request seeks:

a.  All reports, memos, documents, correspondence (including attachments) to Congress concerning BITMAP, Biometrics Data Sharing Partnerships (BDSPs) since 2019, including information regarding: 1) the signing of any new BITMAP/BDSP agreement; 2) the identification of the foreign country; 3) the location at which such operations will be conducted; 4) the terms and conditions for personnel operating at such location. *See id.*

b.  All underlying documentation (*e.g.*, statements/scopes of work, performance work statements, MOUs, amendments, guidelines, correspondence with grantee, correspondence with foreign government agencies concerning the proposed work, and proof of delivery) related to grant no. SPRMCO24VC0010 awarded to IOM in 2024 to provide "safe mobility office initiative support." *See id.*

c.  All agreements between the U.S. Government and UNHCR and/or IOM, related to SMOs, including all underlying documentation, and related correspondence, meeting notes, memos and attachments, since 2019. *See id.*

d.  All correspondence (including attachments), communications, meeting notes with or involving the Foreign Affairs Officer and other members of the Lawful Migration Task Force at the Bureau of Population, Refugees and Migration (PRM) regarding the implementation of the Safe Mobility Office initiative in Colombia, Ecuador, Guatemala, and/or Costa Rica. *See id.*

e.  All memos, reports, correspondence (including attachments), meeting notes and documentation providing information on the location, progress and operations of existing and planned SMOs in these countries, including the

24

number of federal government personnel deployed to support the SMOs, and
statistics concerning the outcome of individual cases processed through each
operational SMO, including (disaggregated by location of SMO, geolocation
of registration and application submission, as well as applicant nationality
(including unknown), age, and gender):

    i.   Registrations on the SMO portal

   ii.   Referrals to the U.S. Refugee Admissions Program ("USRAP")

  iii.   Refugee resettlement approvals

  iv.   Referrals to other legal migration pathways

   v.   Completed applications

  vi.   Refugee arrivals

*See id.* at 12-13.

f.  All correspondence (including attachments), communications, meeting notes
with or involving staff at the US Embassies in Mexico City, Guatemala, San
Jose, Bogotá, Quito, Tegucigalpa and San Salvador, referencing the
implementation of the Safe Mobility Initiative with foreign governments
and/or international agencies (*i.e.* UNHCR and IOM). *See id.* at 13.

g.  All documentation (*e.g.*, requests for proposals, bidding documents, contracts,
statements/scopes of work, performance work statements, award justification,
MOUs, modifications to the contract, correspondence with contractors,
correspondence with foreign government agencies concerning the proposed
services, proof of delivery) for the Indefinite Delivery Contract
72051421D00008 (including delivery orders 72051421D00008-

72051421F00018 and 72051421D00008-72051422F00005) related to the

Venezuela Response and Integration (VRI) initiative. *See id.*

h.  All memoranda of cooperation (MOCs), memoranda of understanding

(MOUs), amendments, agreements, treaties or documents (collectively,

"agreements") signed between the US Government (DHS/DOS) and Panama,

Mexico, El Salvador, Honduras, Guatemala, Colombia and/or Costa Rica

since 2019 for the purpose of biometrics data sharing (including but not

limited to Biometric Data Sharing Partnerships). *See id.*

i.  For all agreements related to BDSPs entered into with the governments of

Panama, El Salvador, Honduras, Costa Rica and/or Colombia, we request all

records regarding the: i) Background to the agreement, ii) Overview of

sharing, iii) Organizations, iv) Purpose and Use, v) Data Elements, vi)

Applicable SORN Routine Uses, vii) Partner Notice, viii) Retention, and ix)

Review and Performance Monitoring. *See id.*

j.  All records regarding changes made to each subsection of the OBIM IDENT

Privacy Impact Assessment (DHS/OBIM/PIA-001) Appendix CC relating to

U.S.-Mexico Biometric Information Sharing; as well as all records concerning

the procedures to be used by DHS personnel to query Mexican holdings in

IDENT and/or querying procedures to be used in Mexico's biometric

database(s), including any records related to real-time query access to

Mexico's biometric database(s) by DHS personnel. *See id.*

k.  All records developed for foreign partners relating to managing the

International Biometric Information Sharing Program (IBIS), BDSP, the

26

secure real-time platform (SRTP) or the Automated Real-Time Identity Exchange System (ARIES). *See id.*

l.  All correspondence (including attachments), communications, meeting notes to/from/involving the Office of Strategy, Policy, and Plans (PLCY) regarding negotiations with foreign governments to arrange biometrics data sharing partnerships and/or concerning IBIS-BDSP, SRTP, and ARIES. *See id.* at 13-14.

m.  All correspondence (including attachments), letters, and notes related to meetings attended by Dawn McGuiness, BDSP Program Manager at DHS, involving members of government agencies of Panama, Mexico, Guatemala, Honduras, Colombia, and/or El Salvador since March 2022. *See id.* at 14.

n.  Copies of all documentation (*i.e.*, requests for proposals, bidding documents, contracts, statements/scopes of work, performance work statements, award justification, MOUs, modifications to the contract, correspondence with contractors, correspondence with foreign government agencies concerning the proposed services, proof of delivery, actor relationship diagrams, use case models, software models, framework class diagrams, framework sequence diagrams, component diagrams, deployment diagrams, entity relationship diagram, data dictionaries, functional and technical overviews, enterprise applications architecture and architecture standards, design artifacts such as storyboards, risk management plans, and/or procurement libraries) for the following contracts awarded by DHS Office of the Chief Procurement Officer, of the US Department of Homeland Security:

        i.  47QTCK18D0003-70RCSA20FR0000078 (delivery order), including all ten subcontracts. *See id.*

  o.  All records and correspondence (including attachments), communications, meeting notes to/from/within DHS components and/or between DHS components and foreign partners in response to or regarding the implementation of former Secretary of Homeland Security John Kelly's May 24, 2017, memorandum on "expanding the age of the population subject to biometric collection." *See id.*

52.    Regarding CBP One and Secure Docket Card Program, the Request seeks:

  a.  All records (*i.e.*, statements/scopes of work, performance work statements, delivery orders, blanket purchase agreements) related to the provision of IT and programming services (including architecture and planning, development and implementation, operations and maintenance, operations/database support, or governance support) for the CBP One Mobile Application (and/or CBP One, CBP OneTM or similar permutations) since 2019. *See id.*

  b.  All records (*i.e.*, statements/scopes of work, performance work statements, delivery orders, blanket purchase agreements) involving NTT Data Federal Services Inc for services categorized under the NAICS code 541511 for "Custom Computer Programming Services" since 2019. *See id.*

  c.  All consent forms, releases, privacy policies and notices routinely provided to CBP One users and/or migrants regarding the collection of data (including personal data) by CBP agents and/or the CBP One application for the purposes of CBP One use and CBP One appointments. *See id.*

d.  All records related to the criteria to be used (*e.g.*, date of registration, nationality, number of people in group, age of applicant(s), education level of applicant(s), records of prior entry or apprehension, or the use of special categories with DHS or CBP systems such as national security, hot list, or special interest countries) for prioritization of appointment assignments within the CBP One appointment lottery system, as well as all records related to any rules-based tools or systems involved in prioritization and processing of CBP One appointments, since 2020. *See id.*

e.  All records (*e.g.*, sub-regulatory policies, protocols, rules, guidelines, or training materials) providing guidance on the administration of CBP One appointments by CBP personnel, since 2020, regarding the case evaluation and processing of individuals with a record of past detention, expulsion, removal or deportation from the United States. *See id.* at 15.

f.  The number of individuals detained for more than 48 hours following a CBP One appointment, disaggregated by month since 2020, and further disaggregated to indicate the number of individuals sent to ICE detention specifically, as well as by nationality (including unknown), age, and gender. *See id.*

g.  All records since 2020 detailing the outcomes (*e.g.*, parole, conditional release, arrest, detention, deportation, or removal) of CBP One appointments for individuals with antecedents of encounters, apprehensions, arrests or detention in the United Status, expulsion under Title 42, or deportation under Title 8 from the United States. *See id.*

h.  All records related to any pilot notification and/or appropriations requests to Congress regarding the Secure Docket Card (SDC) program (including attachments). *See id.*

i.  All records (*i.e.*, statements/scopes of work, performance work statements, delivery orders, blanket purchase agreements) related to the provision of IT and programming services (including architecture and planning, development and implementation, operations and maintenance, operations/database support, or governance support) for the SDC program including any database(s) that will process data in connection with the SDC program, since 2020. *See id.*

j.  All internal policies, directives, or other guidance regarding the SDC program, including all internal communications (*e.g.*, bulletins, briefs, memoranda, training materials) regarding the SDC program. *See id.*

k.  All records (*i.e.*, data dictionaries, schema declarations, documentation, indexes, depictions, guidelines, policies, designs (proposed, accepted and rejected), performance assessment evaluation criteria and metrics) related to the technical design, operation and evaluation of the SDC and its components and features. *See id.*

53.     Plaintiffs requested expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E) and a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). *See id.* at 15, 17.

**C.     Agency Responses and Exhaustion of Administrative Remedies**

54.     On September 9, 2024, Plaintiffs submitted their Request to DOS, NIST, CBP, ICE, DHS, and USAID. *See* **Exhibit A**.

30

55.    ***Defendant DOS has never substantially responded to the Request.*** DOS
acknowledged receipt of the Plaintiffs' Request on October 7, 2024. *See* **Exhibit B**. In the same
email, DOS denied Plaintiffs' request for expedited processing *See id.* In denying Plaintiffs'
request for expedited processing, DOS erroneously concluded that Plaintiffs had not demonstrated
"compelling need" for the information called for by the Request under 22 C.F.R. § 171.11(f). In
the same October 7, 2024, email, DOS invoked 5 U.S.C. § 552(a)(6)(B) in claiming that it would
"not be able to respond within the 20 days provided by the statute due to 'unusual circumstances.'"
*See id.* DOS stated that "[i]n this instance, the unusual circumstances include the need to search
for and collect requested records from other Department offices or Foreign Service posts." *Id.* DOS
failed to provide in this email "the date on which a determination is expected to be dispatched" as
required under 5 U.S.C. § 552(a)(6)(B). The extension of the time within which DOS was required
to respond to Plaintiffs' Request, including the Section 552(a)(6)(B) extension, which was limited
by statute to 10 working days, expired on or around October 22, 2024. DOS failed to respond to
Plaintiffs' Request by this deadline.

56.    On October 27, 2024, Plaintiffs timely appealed DOS's denial of Plaintiffs' request
for expedited processing of the Request. *See* **Exhibit C**. In a letter dated November 29, 2024, DOS
denied Plaintiffs' appeal, erroneously claiming without explanation that Plaintiffs' "request and
appeal do not meet the established criteria" for expedited processing and that Plaintiffs "have not
provided adequate justification for expedited processing." *See* **Exhibit D**. As of the date of this
Complaint, eights months after Plaintiffs submitted the Request, DOS has neither substantively
responded to the Request nor produced documents in response to the Request.

57.    ***Defendant NIST has never substantially responded to the Request.*** In a letter dated
September 10, 2024, NIST acknowledged receipt of Plaintiffs' Request. *See* **Exhibit E**. The time

prescribed by statute for NIST to respond to Plaintiffs' Request expired on or around October 7, 2024. Besides acknowledging receipt of the Request, NIST has otherwise not responded to Plaintiffs' Request, nor has NIST produced any documents in response to the Request.

58.    ***Defendant CBP has failed to produce the vast majority of documents responsive to the Request.*** In an email dated October 15, 2024, CBP acknowledged receipt of Plaintiffs' Request. *See* **Exhibit F**. CBP directed Plaintiffs to records related to the CBP One mobile application that it said may be potentially responsive to Plaintiffs' Request in the CBP FOIA Reading Room. Plaintiffs have reviewed these documents and determined that they are not fully responsive to Plaintiffs' Request. While some of the documents in the CBP FOIA Reading Room are somewhat responsive to the Request for certain records (primarily the requests related to IT and programming for CBP One and consent forms, releases, privacy policies, and notices to users of CBP One), the documents do not address significant portions of the Request. For example, the documents in the CBP FOIA Reading Room are not responsive to the requests for records on NTT Data Federal Services Inc., the number of individuals detained for over 48 hours, or the outcomes of CBP One appointments for individuals with antecedents of encounters, apprehensions, arrests, or detentions. Further, the documents are not responsive to significant portions of the other requests, including, for example, requests for statements of work, performance statements, delivery orders, and blanket purchase agreements related to IT and programming of CBP One; criteria for prioritizing appointment assignments through the CBP One lottery system; or guidance regarding the case evaluation and processing of individuals with a record of past detention, expulsion, removal, or deportation from the U.S.

59.     In the same email, CBP invoked a 10-day extension to respond to Plaintiffs' Request pursuant to 6 C.F.R. § 5.5(c) because Plaintiffs' Request sought "documents that will require a thorough and wide-ranging search." *See id.*

60.     In an email dated April 4, 2025, CBP stated it was granting the Request and directed Plaintiffs to documents in the CBP FOIA Reading Room. *See* **Exhibit G**. CBP stated in the same email that it is "unable to perform a search for contract information without a contract number" and requested Plaintiffs resubmit that portion of the Request, providing contract numbers to search. In the same email, CBP administratively closed the Request. *See id.*

61.     While some of the documents in the CBP FOIA Reading Room are responsive to the Request for certain records (primarily the requests related to IT and programming for CBP One and consent forms, releases, privacy policies, and notices to users of CBP One), the documents do not address significant portions of the Request. For example, the documents in the CBP FOIA Reading Room are not responsive to the requests for records on NTT Data Federal Services Inc., requests for statements of work, performance statements, delivery orders, and blanket purchase agreements related to IT and programming of CBP One; criteria for prioritizing appointment assignments through the CBP One lottery system; or guidance regarding the case evaluation and processing of individuals with a record of past detention, expulsion, removal, or deportation from the U.S. Further, while CBP provided data on individuals who were processed using CBP One, it did not provide data specifically responsive to the Request, including records regarding individuals detained for more than 48 hours following a CBP One appointment (including the number of individuals sent to ICE detention specifically) and outcomes of CBP One appointments for individuals with antecedents of encounters, apprehensions, arrests or detention in the United States, expulsion under Title 42, or deportation under Title 8 from the United States.

62.    The CBP's administrative closure of the request without providing documents related to contracts and other documents responsive to the Request is improper and demonstrates a lack of good faith in responding to the Request. Plaintiffs provided several alternative search parameters in the Request to identify contracts and related documents, including the names of specific programs and services, contractors, and NAICS codes. During the nearly seven months CBP failed to respond to the Request, CBP did not contact Plaintiffs to revise or narrow the Request.

63.    The time prescribed by statute for CBP to respond to Plaintiffs' Request expired on or around October 22, 2024.Therefore, as of the date of this Complaint, eight months after Plaintiffs submitted the Request, the Defendant CBP has failed to provide an adequate or proper response to the Request.

64.    ***Defendant ICE has never substantially responded to the Request.*** On September 13, 2024, ICE responded to Plaintiffs via SecureRelease that it administratively closed the Request as pertains to requested records from that agency (Ref. 2024-ICFO-55442). ICE determined that Plaintiffs' Request was too broad in scope and did not specifically identify the records Plaintiffs were seeking, as required under 6 C.F.R. § 5.3(b). On October 28, 2024, Plaintiffs submitted a new Request to ICE (the "ICE Renewed Request"), modifying the original Request to ICE to narrow the scope of the documents requested and more specifically identify the records Plaintiffs seek. *See* **Exhibit H**.

65.    In an email dated November 5, 2024, ICE denied Plaintiffs' request for expedited processing, erroneously claiming that Plaintiffs did not demonstrate "an imminent threat to the life or physical safety of an individual" and did not detail with specificity "an urgency to inform the public about the Secure Docket Program." *See* **Exhibit I**. In the same email, ICE invoked a 10-

day extension to respond to Plaintiffs' ICE Renewed Request pursuant to 5 U.S.C. § 552(a)(6)(B) because the ICE Renewed Request "seeks numerous documents that will necessitate a thorough and wide-ranging search." *See id*.

66.     On December 20, 2024, Plaintiffs timely appealed ICE's denial of Plaintiffs' request for expedited processing of the ICE Renewed Request. *See* **Exhibit J**. In a letter dated January 23, 2025, ICE denied Plaintiffs' appeal, claiming that Plaintiffs did not "provide any specific evidence demonstrating that standard processing of the request would pose an imminent threat to the life or physical safety of any particular individual"; provide "substantial evidence to suggest that a delayed response . . . would compromise a significant recognized interest" or demonstrate that the Request "concerns a matter of current exigency to the American public"; or show "a loss of substantial due process rights." *See* **Exhibit K**. The time prescribed by statute for CBP to respond to Plaintiffs' ICE Renewed Request expired on or around December 12, 2024. As of the date of this Complaint, eight months after Plaintiffs submitted the ICE Renewed Request, ICE has neither substantively responded to the ICE Renewed Request nor produced documents in response to the ICE Renewed Request.

67.     ***Defendant DHS has never substantially responded to the Request.*** On September 12, 2024, DHS responded to Plaintiffs' Request via email and requested a call to clarify the Request. *See* **Exhibit L**.

68.     DHS and Plaintiffs had a phone call on November 12, 2024, to discuss the status of DHS's response to the Request. **Exhibit M**. During the call, DHS indicated that it was actively searching for records responsive to the Request and had forwarded certain requests to appropriate departments and agencies within DHS, including ICE. *See id*. In an email on December 2, 2024, DHS indicated that it would update Plaintiffs with an estimate on timing for its response to the

Request after receiving the relevant records. *See id*. Plaintiffs never received that email. The time

prescribed by statute for DHS to respond to Plaintiffs' Request expired on or around October 22,

2024. As of the date of this Complaint, eight months after Plaintiffs submitted the Request, DHS

has not produced documents in response to the Request.

69.    ***Defendant USAID has never substantially responded to the Request.*** On

September 12, 2024, USAID responded to the Request and suggested narrowing the scope of the

Request in order for Plaintiffs to receive a quicker response. *See* **Exhibit N**. In an email dated

September 16, 2024, to accommodate USAID, Plaintiffs requested a modification to the Request.

*See id*. On October 28, 2024, USAID accepted the modification. *See id*. The time prescribed by

statute for USAID to respond to Plaintiffs' Request expired on or around October 22, 2024. As of

the date of this Complaint, eight months after Plaintiffs submitted Request, USAID has not

produced documents in response to the Request.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
*Against All Defendants*

**Violation of the Freedom of Information Act, 5 U.S.C. § 552, and 6 C.F.R. § 5.6(c)
Promulgated Thereunder, for Failure To Disclose Responsive Agency Records**

70.    Plaintiffs repeat, allege, and incorporate by reference the allegations in paragraphs

1 through 69 as though fully set forth therein.

71.    Defendants have violated 5 U.S.C. § 552(a)(3)(A) and 5 U.S.C. § 552(a)(6)(A), as

well as 6 C.F.R. § 5.6(c), promulgated thereunder by improperly withholding documents

responsive to the Request.

72.    Defendants are obligated under 5 U.S.C. § 552(a)(3) to produce records responsive

to Plaintiffs' Request.

73.    Defendants were required to respond to Plaintiffs' Request within 20 business days under 5 U.S.C. § 552(a)(6)(A) and 6 C.F.R. § 5.6(c), promulgated thereunder.

74.    No basis exists for Defendants' failures to provide responses to Plaintiffs' Request. Plaintiff has constructively exhausted its administrative remedies under the FOIA by virtue of each Defendant's failure to reach a determination on the Request and release responsive documents to Plaintiffs.

75.    5 U.S.C. § 552(a)(4)(B) authorizes the grant of injunctive relief to Plaintiffs because Defendants continue to flout the FOIA and improperly withhold responsive records.

76.    28 U.S.C. § 2201 authorizes declaratory relief because an actual and justiciable controversy exists regarding Defendants' improper withholding of agency records in violation of the FOIA.

**SECOND CAUSE OF ACTION**
*Against All Defendants*

**Violation of the Freedom of Information Act, 5 U.S.C. § 552, for Failure to Conduct an Adequate Search of Agency Records**

77.    Plaintiffs repeat, allege, and incorporate by reference the allegations in paragraphs 1 through 69 as though fully set forth therein.

78.    Defendants DOS, NIST, CBP, ICE, DHS, and USAID have failed to produce any responsive records.

79.    Each Defendant is obligated under 5 U.S.C. § 552(a)(3)(C) to conduct a reasonable search for and to produce records responsive to Plaintiffs' Request. Plaintiffs have a legal right to obtain such records, and no legal basis exists for Defendants' failure to conduct reasonable searches for records through the present date.

80.     Defendants' failure to conduct a reasonable search for records responsive to Plaintiffs' Request violates 5 U.S.C. § 552(a)(3)(C) and (a)(6)(A), as well as 6 C.F.R. § 5.6(c) promulgated thereunder.

81.     5 U.S.C. § 552(a)(4)(B) authorizes the grant of injunctive relief to Plaintiffs because Defendants continue to flout the FOIA and improperly withhold responsive records.

82.     28 U.S.C. § 2201 authorizes declaratory relief because an actual and justiciable controversy exists regarding Defendants' improper withholding of agency records in violation of the FOIA.

### THIRD CAUSE OF ACTION
#### *Against All Defendants*

### Violation of the Freedom of Information Act, 5 U.S.C. §§ 706(1) & (2), for Failure to Respond to the Request for Agency Records

83.     Plaintiffs repeat, allege, and incorporate by reference the allegations in paragraphs 1 through 69 as though fully set forth therein.

84.     Each Defendant's failure to respond to Plaintiffs' Request for agency records constitutes "agency action unlawfully withheld and unreasonably delayed" in violation of the Administrative Procedure Act, 5 U.S.C. § 706(1).

85.     Additionally, each Defendant's failure to timely respond to the Request is "arbitrary, capricious, an abuse of discretion" and otherwise unlawful. 5 U.S.C. § 706(2).

86.     5 U.S.C. § 552(a)(4)(B) authorizes the grant of injunctive relief to Plaintiffs because Defendants continue to flout the FOIA and improperly withhold responsive records.

87.     28 U.S.C. § 2201 authorizes declaratory relief because an actual and justiciable controversy exists regarding Defendants' improper withholding of agency records in violation of the FOIA.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request that judgment be entered in its favor and against each Defendant, and that the Court:

A.    Declare unlawful each Defendant's refusal to disclose the records requested;

B.    Declare that each Defendant's failure to make a determination with respect to Plaintiffs' Request within the statutory time limit and each Defendant's failure to disclose responsive records violates the FOIA;

C.    Declare that each Defendant's failure to timely respond to Plaintiffs' request for agency records violates the Administrative Procedure Act;

D.    Order and Direct each Defendant and any of Defendants' departments, components, other organizational structures, agents, or other persons acting by, through, for, or on behalf of any of Defendants to conduct a full, adequate, and expeditious search for records responsive to Plaintiffs' Request and to produce any and all such records to Plaintiffs;

E.    Enjoin each Defendant from charging Plaintiffs to search, review, and duplication fees relating to the Request;

F.    Enjoin Defendants, and any of their departments, components, other organizational structures, agents, or other persons acting by, through, for or on behalf of Defendants from withholding non-exempt records responsive to the Request and order them to promptly produce the same without redaction;

G.    Award Plaintiffs their reasonable attorney fees and costs pursuant to 5 U.S.C. § 552(a)(4)(E)(i); and

H.    Grant any such other or further relief as the Court deems just and equitable.

Dated:  May 9, 2025

Respectfully submitted,


*/s/ Kerri Webb*_____
Kerri Webb
Bar No. 1632192
Mayer Brown LLP
1999 K St NW
Washington, DC 20006
Phone: (202) 263-3000
*kwebb@mayerbrown.com*

Sophie Mancall-Bitel (*pro hac vice submitted herewith*)
Mayer Brown LLP
333 South Grand Avenue 47th Floor
Los Angeles, CA 90071-1503
Phone: (213) 229-9500
*smancall-bitel@mayerbrown.com*

Laura Bingham (*pro hac vice submitted herewith*)
Institute for Law, Innovation & Technology
Temple University, Beasley School of Law
1719 N. Broad Street
Philadelphia, PA 19122
Phone: (917) 294-4139
*laura.bingham@temple.edu*