UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INSTITUTE FOR LAW, INNOVATION, & TECHNOLOGY, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DEPARTMENT OF STATE, et al.,<br><br>Defendants. | Civil Action No. 25-1418 (SLS) |

**PLAINTIFFS' BRIEF ON ISSUES PRESENTED IN JUNE 3, 2026, ORDER**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ... 1

STATEMENT OF FACTS ... 2

LEGAL STANDARD ... 6

ARGUMENT ... 6

I. PLAINTIFFS' REQUESTS WERE REASONABLY DESCRIBED. ... 6

II. PLAINTIFFS NEGOTIATED WITH STATE IN GOOD FAITH TO NARROW THE UNIVERSE OF POTENTIALLY RESPONSIVE RECORDS. ... 9

A. Plaintiffs Have Worked In Good Faith With State to Narrow the Production. ... 10

B. Plaintiffs Have Made Substantial, Concrete Cuts to the Universe of Documents. ... 12

III. THE AGREED-UPON UNIVERSE OF POTENTIALLY RESPONSIVE DOCUMENTS IS NOT UNDULY BURDENSOME. ... 14

CONCLUSION ... 17

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Fed'n of Gov't Emps., Local 2782 v. U.S. Dep't of Commerce*,
907 F.2d 203 (D.C. Cir. 1990) ....................6, 14, 16

*Ayuda v. Federal Trade Commission*,
70 F. Supp. 3d 247 (D.D.C. 2014) ....................14, 15

*Bader Fam. Found. v. U.S. Equal Emp. Opportunity Comm'n*,
2025 WL 915563 (D.D.C. Mar. 26, 2025) ....................8, 9

*Colbert v. Fed. Bureau of Investigation*,
2018 WL 6299966 (D.D.C. Sept. 3, 2018) ....................17

*Freedom Watch v. Bureau of Land Management*,
325 F. Supp. 3d 139 (D.D.C. 2018) ....................15

*Goland v. CIA*,
607 F.2d 339 (D.C. Cir. 1978) ....................6, 14

*Gun Owners of Am., Inc. v. FBI*,
594 F. Supp. 3d 37 (D.D.C. 2022) ....................7

*Heritage Found. v. U.S. Dep't of Homeland Sec.*,
2026 WL 734061 (D.D.C. Mar. 16, 2026) ....................8, 9

*Judicial Watch, Inc. v. U.S. Department of State*,
2017 WL 3913212 (D.D.C. 2017) ....................15

*McGehee v. DOJ*,
362 F. Supp. 3d 14 (D.D.C. 2019) ....................15

*Middle E. F. v. United States Dep't of Treasury*,
317 F. Supp. 3d 257 (D.D.C. 2018) ....................8, 9, 11

*Middle E. Forum v. U.S. Dep't of Homeland Sec.*,
297 F. Supp. 3d 183 (D.D.C. 2018) ....................15

*Nation Magazine v. U.S. Customs Serv.*,
71 F.3d 885 (D.C. Cir. 1995) ....................6, 7, 14

*People for American Way Foundation v. U.S. Dep't of Justice*,
451 F. Supp. 2d 6 (D.D.C. 2006) ....................14

*Pinson v. U.S. Dep't of Justice*,
80 F. Supp. 3d 211 (D.D.C. 2015) .......... 14, 16

*Prop. of the People, Inc. v. U.S. Dep't of Justice*,
530 F. Supp. 3d 57 (D.D.C. 2021) .......... 14

*Reps. Comm. for Freedom of Press v. FBI*,
877 F.3d 399 (D.C. Cir. 2017) .......... 14, 16

*Republican Nat'l Comm. v. United States Dep't of State*,
2016 WL 9244625 (D.D.C. Sept. 16, 2016) .......... 17

*Schiff v. Internal Revenue Serv.*,
2026 WL 820437 (D.D.C. Mar. 25, 2026) .......... 7, 8

*Seavey v. Department of Justice*,
266 F. Supp. 3d 241 (D.D.C. 2017) .......... 15, 17

*Shapiro v. CIA*,
170 F. Supp. 3d 147 (D.D.C. 2016) .......... 7

*Truitt v. Dep't of State*,
897 F.2d 540 (D.C. Cir. 1990) .......... 6, 9

*Yeager v. DEA*,
678 F.2d 315 (D.C. Cir. 1982) .......... 6, 7, 9

**Other Authorities**

22 C.F.R. § 171.4(b) .......... 6, 8

## INTRODUCTION

In this Freedom of Information Act ("FOIA") case, Plaintiffs have now reached agreement with every defendant agency regarding the universe of responsive records to be processed in response to Plaintiffs' FOIA requests (the "Requests"). In particular, Plaintiffs have worked with Defendant the Department of State ("State" or the "Department") to identify a universe of records that would not be unduly burdensome for State to process. Together, Plaintiffs and State identified approximately 10,500 pages of responsive materials that State will process. State agrees that this universe of records is reasonable and contemplates completing this production in less than three years at its proposed processing rate of 300 pages per month. The Parties expect that based on Plaintiffs' further narrowing by date of one Request and typical efficiencies gained over the course of processing, production may be completed sooner, but State cannot assess any potential faster processing due to specific efficiencies until it begins processing the documents.

At the last status conference in this litigation, the Court instructed Plaintiffs to file this brief "addressing why a FOIA request that yielded over 2 million records, has taken hundreds of hours of agency time to attempt to narrow, and will currently take 14 years to process, is not unduly burdensome." June 3, 2026, Minute Order. Plaintiffs agree with the Court that processing two million records, or processing records for more than 14 years, would place a significant undue burden on State and respectfully submit that the Court's Order was based on an inaccurate premise. While State initially identified a potentially responsive universe of over two million records, that number was significantly inflated because State unilaterally chose search terms that were overbroad and led to many false positive search hits. State eliminated over two million records by removing the problematic search term. Still recognizing the obvious problem with both the initial result and the volume of records remaining after State's revised search, Plaintiffs have spent the

intervening months working to reduce the number to a reasonable and non-burdensome set of records for processing. This has included limiting the scope of their Requests both in subject matter and time, revising State's proposed search terms to narrowly target the records Plaintiffs seek, working with State to reduce the number of databases it would search, and agreeing to drop six Requests altogether. Plaintiffs have done this at an informational disadvantage, as they have little visibility into State's search procedures and mechanisms. Plaintiffs' and State's agreed-upon universe of 10,500 pages is a result of Plaintiffs' many concessions during this process.

Plaintiffs appreciate the significant efforts made by State and Defendants' counsel to reach this agreement, including their willingness to run certain test searches and confer regarding ways to narrow the universe of potentially responsive records. They also seek to limit any burden on the Court or its docket in managing this litigation. To that end, Plaintiffs respectfully request that the Court order the defendant agencies to begin processing the responsive records they have identified so the parties may move towards a resolution of this matter.

## STATEMENT OF FACTS

### A. The Original Requests

Plaintiffs the Institute for Law, Innovation & Technology ("iLIT"), Red en Defensa de los Derechos Digitales ("R3D"), and Surveillance Resistance Lab ("SRL") (collectively, "Plaintiffs") are nonprofit and academic public-interest organizations dedicated to studying and addressing the civil and human rights implications of government technology systems, particularly in the immigration and border-enforcement context along migration corridors in the Americas region. On September 9, 2024, Plaintiffs submitted ten FOIA Requests to Defendant the Department of State ("State"). *See* Declaration of Kerri Webb, July 3, 2026 ("Webb Dec.") Ex. A. The Requests sought documents related to the use and sharing of biometric data and technology with foreign

governments in this region by the U.S. federal government in border enforcement and migration control. *See id.* The Requests identified the categories of records sought with specificity, including by reference to particular contract numbers, grant numbers, named programs, date ranges, and the specific bureaus, offices, and embassies likely to hold responsive records. *See id.*

Plaintiffs seek these records to (1) conduct and disseminate investigative research on the federal government's funding of specific technology and infrastructure in foreign countries to facilitate the cross-border use and sharing of biometric data in migration control and (2) investigate inequities and human rights violations in connection with these cross-border data sharing programs and the extent to which their implementation in fact facilitated biometric data collection and sharing. As described in detail in the First Amended Complaint ("FAC"), the public information about the biometric data sharing programs developed and utilized by the U.S. government is currently limited and fails to address key questions regarding the collection, use, and sharing of that data, particularly across international borders, the answers to which have significant impacts on human rights both inside and outside the United States.

**B. Plaintiffs' Work With State to Narrow the Requests' Scope**

Plaintiffs filed this lawsuit on May 9, 2025, and filed the FAC on July 21, 2025. State provided its initial search results on August 20, 2025, based on search parameters that State selected unilaterally and did not contemporaneously share with Plaintiffs. *See* Webb Dec. Ex. B at 134–38. These results identified over two million potentially responsive records. *See id.* As Plaintiffs learned eight months later, over 2,200,000 of those records were an artifact of State's own search design: an abbreviation State used for a biometric program was identical to an unrelated abbreviation commonly appearing in State records, generating millions of false hits with no connection to Plaintiffs' Requests. *See* Webb Dec. ¶ 13; *id.* Ex. B at 85–86, 135–36; *id.* Ex. F.

Once State corrected the issue and provided updated results to Plaintiffs reflecting its searches to date, the Requests in fact yielded records numbering in slightly over 100,000 records, not the millions. *See id.*

Since receiving State's initial results, Plaintiffs have worked in good faith to narrow the scope of the Requests such that their processing would not impose an undue burden on State. The same day Plaintiffs received State's initial results, Plaintiffs sought to schedule a meeting with State. *See* Webb Dec. Ex. B at 134; *id.* Ex. C. On September 17, 2025, Plaintiffs provided State with questions and topics to allow informed narrowing, including the records searched, the search terms used, the number of hits on search terms, and the Requests State sought to narrow, per State's request ahead of a meeting, and followed up on September 19, 2025. *See* Webb Dec. Ex. C. Before any meeting occurred, however, the federal government closed for what would be its longest-ever full shutdown (October 1, 2025 to November 12, 2025). Defendants' counsel was unable to communicate with Plaintiffs regarding the case during that period. *See* Webb Dec. Ex. D.

Since the shutdown ended, the Parties have worked to narrow the universe of potentially responsive documents that State will process in response to Plaintiffs' Requests. Plaintiffs have narrowed the records system searches by date range, search terms, custodians, and subject matter, withdrawn requests, and scoped out large, outlier files. *See* Webb Dec. Ex. B at 1–2, 13–14, 20, 23, 33, 35–36, 42, 72–73, 79–81, 101–104. Plaintiffs' ability to identify these strategies and determine appropriate concessions depended on information in State's control, such as the nature and functionality of State's records systems and search capabilities, and the results of proposed limiting search terms. Thus, the narrowing process required input from State. *See id.* at 1–8, 12–16, 20, 23–27, 34–38, 42–43, 55, 57–59, 62–65, 74–76, 79–82, 85–92, 101–108; *id.* Ex. C, *id.* Exs. E–J.

Plaintiffs faced some additional obstacles. For example, on April 7, 2026, State identified over 10,000 additional potentially responsive documents that had been omitted from its earlier counts due to an inadvertent error. *See* Webb Dec. Ex. F. Additionally, State did not start to provide page counts (which determine the review time) until April 24, 2026. *See* Webb Dec. Ex. B at 27. Moreover, until that date, State was unable to provide de-duplicated record or page counts. *See id.*; Webb Dec. Ex. E at 4–5. Because the records would be de-duplicated before review, the non-de-duplicated search term results were inflated to an unknown degree. *See* Webb Dec. Ex. E at 4–5.

**C. The Parties Agree On a Non-Burdensome Scope of Production**

On June 22, 2026, per the Court's June 3, 2026, Order, the Parties met and conferred to discuss the document universe. During the meet and confer, the Parties agreed to limit the scope of State's production to approximately 10,500 pages to be processed at State's standard rate of 300 pages per month. To achieve this result, over the course of the narrowing process, Plaintiffs proposed narrowing search terms and criteria to more precisely target the documents sought in the Requests. Ultimately, Plaintiffs agreed to forgo all documents potentially responsive to six of ten Requests. *See* Webb Dec. Ex. B at 1–2. Plaintiffs also made significant concessions with respect to the remaining Requests, including excluding documents related to 26 contracts and excluding classified documents from the Requests, which certainly excluded responsive documents. *See id.* at 20. These exclusions were not based on information or belief that the records held were not responsive to Plaintiffs' Requests. Rather, the exclusions were based on reducing the page count to a reasonable number, the cancellation of a program that was the subject of certain Requests, and Plaintiffs' prioritization of specific documents responsive to four Requests.

**LEGAL STANDARD**

FOIA imposes two distinct thresholds. First, the requester must "reasonably describe[ ]" the records sought—*i.e.*, describe them well enough that "a professional employee of the agency who was familiar with the subject area of the request [could] locate the record with a reasonable amount of effort." *Truitt v. Dep't of State*, 897 F.2d 540, 545 n.36 (D.C. Cir. 1990). Second, even where a request is reasonably described, an agency need not honor a request that would require an "unreasonably burdensome search." *Am. Fed'n of Gov't Emps., Local 2782 v. U.S. Dep't of Commerce (AFGE)*, 907 F.2d 203, 209 (D.C. Cir. 1990); *see also Goland v. CIA*, 607 F.2d 339, 353 (D.C. Cir. 1978). The burden of proof for undue burden rests on the agency, not the plaintiff. *See Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 892 (D.C. Cir. 1995).

**ARGUMENT**

**I. PLAINTIFFS' REQUESTS WERE REASONABLY DESCRIBED.**

According to State's regulations, a FOIA request is reasonably described when it "describe[s] the records sought in sufficient detail to enable agency personnel to locate them with a reasonable amount of effort." 22 C.F.R. § 171.4(b); *see also Truitt*, 897 F.2d at 545 & n.36 (quoting H.R. Rep. No. 93–876, at 6 (1974)) ("A 'description' of a requested document would be sufficient to enable a professional employee of the agency who was familiar with the subject area of the request to locate the record with a reasonable amount of effort."). The "linchpin inquiry" is therefore not whether a request is narrow or broad, but rather "whether the agency is able to determine precisely what records [are] being requested." *Yeager v. DEA*, 678 F.2d 315, 326 (D.C. Cir. 1982). Where the agency can identify the universe of records called for, the request is reasonably described. *See Truitt*, 897 F.2d at 544–45 & n.36. "Vague words and descriptions" are insufficient, as are requests seeking documents that "regard[] in any way" a particular subject.

*Schiff v. Internal Revenue Serv.*, 2026 WL 820437, at *8 (D.D.C. Mar. 25, 2026), *amended on other grounds*, 2026 WL 1707605, at *1 (D.D.C. June 12, 2026). However, a requester is not required to "guess at a document's title" or to anticipate "what terminology the agency might have used," because "FOIA requesters are frequently in no position to know how an agency classifies its documents[.]" *Gun Owners of Am., Inc. v. FBI*, 594 F. Supp. 3d 37, 48 (D.D.C. 2022). For this reason, courts decline to impose any "categorical" or "linguistic litmus test" on the form of a request, and a request is not rendered invalid merely because it uses connective phrases such as "relating to," "involving," or "pertaining to." *Id.* The D.C. Circuit has held that the words "pertaining to" are sufficient to alert an agency to the subject matter sought and to require a search of the corresponding subject-matter files. *Nation Magazine*, 71 F.3d at 890.

The Circuit has also explained that the volume of records a request may yield has no bearing on whether the request is reasonably described. *See Yeager*, 678 F.2d at 326 ("[T]he number of records requested appears to be irrelevant to the determination whether they have been 'reasonably described'"); *see also Shapiro v. CIA*, 170 F. Supp. 3d 147, 154 (D.D.C. 2016) ("Regardless of how onerous it might be to locate them, there can be no dispute about which items are being requested—records in the CIA's possession that 'mention[ ]' Nelson Mandela or his three listed aliases.").

Here, both Plaintiffs' original FOIA Requests and the current document universe are reasonably described. The original Requests reasonably described the records sought because they supplied State with concrete subject-matter, custodial, temporal, and document-type limitations sufficient for a State employee to locate responsive records with reasonable effort. For example, the original Request 7 identified specific document types ("reports, memos, documents, correspondence (including attachments)"), recipients ("to Congress"), subject matter ("concerning

BITMAP, Biometrics Data Sharing Partnerships (BDSPs) . . . including information regarding: 1) the signing of any new BITMAP/BDSP agreement; 2) the identification of the foreign country; 3) the location at which such operations will be conducted; 4) the terms and conditions for personnel operating at such location"), and time periods ("since 2019"). *See* Webb Dec. Ex. A. *Compare with Middle E. F. v. United States Dep't of Treasury*, 317 F. Supp. 3d 257, 264 (D.D.C. 2018) (requests that "included the name of the group, subject matter, IRS office where responsive files would be found, date range, and the types of records sought" were "reasonably described"); *Heritage Found. v. U.S. Dep't of Homeland Sec.*, 2026 WL 734061, at *2 (D.D.C. Mar. 16, 2026) (requests that "specified the subject matter, date, and relevant agency office for the records" were "reasonably described"); *Bader Fam. Found. v. U.S. Equal Emp. Opportunity Comm'n*, 2025 WL 915563, at *4 (D.D.C. Mar. 26, 2025) (request for "a specific type of record . . . held by a limited set of identified custodians . . . containing only certain content" was "reasonably described").

The original Requests identified the relevant bureaus and offices, such as the Bureau of Narcotics and Law Enforcement ("INL"); the relevant programs and initiatives, such as the International Biometric Information Sharing Program; the relevant counterparties, such as the International Organization for Migration; and the categories of records sought, such as contracts, correspondence, and agreements. *See* Webb Dec. Ex. A. Rather than using "vague words and descriptions" or seeking documents that "regard[] in any way" a particular subject, *see Schiff*, 2026 WL 820437, at *8, the Requests provided concrete, objective criteria that enabled State to locate responsive records with reasonable effort. *See* 22 C.F.R. § 171.4(b) ("To the extent possible, requesters should include specific information that may assist the Department in identifying the requested record(s), such as the date, title or name, author, recipient, subject matter, case number, file designation reference number, or timeframe."); *see also Middle E. F.*, 317 F. Supp. at

264. Indeed, the fact that State searched for and identified a specific number of potentially responsive records confirms that the Requests were reasonably described. *See Truitt*, 897 F.2d at 544 ("[A] request which fails to 'reasonably describe [ ]' the documents sought does not trigger a search of agency records.").

Plaintiffs' current document universe is also reasonably described. The documents are limited to specified State systems and custodians, including State's Integrated Logistics Management System, the Office of Acquisition Management's unclassified system, INL's unclassified system, the Bureau of Population, Refugees, and Migration's ("PRM") unclassified system, and certain U.S. embassies; defined date ranges; particular contracts and grant numbers; specified countries; named agencies and counterparties; and targeted document types. For example, the document universe for Request 7 identifies the specific office (PRM's unclassified system), specific search terms to narrow to correspondence with Congress regarding BITMAP and BDSP in certain foreign countries, and time periods (1/1/2019 – 10/11/2024). *See* Webb Dec. Ex. B at 1. Under *Truitt*, *Yeager*, and State's regulations, this is sufficient. Like the original Requests, the narrowed searches specify the subject matter, type of records sought, date ranges, and custodial sources. *See* Webb Dec. Ex. B at 1. The narrowed searches are also "reasonably described." *See Truitt*, 897 F.2d at 545 n.36; *Yeager*, 678 F.2d at 326*; see also Heritage Found.*, 2026 WL 734061, at *2; *Bader Fam. Found.*, 2025 WL 915563, at *4; *Middle E. F.*, 317 F. Supp. 3d at 264 (requests that "included the name of the group, subject matter, IRS office where responsive files would be found, date range, and the types of records sought" were "reasonably described").

## II. **PLAINTIFFS NEGOTIATED WITH STATE IN GOOD FAITH TO NARROW THE UNIVERSE OF POTENTIALLY RESPONSIVE RECORDS.**

Since State's first substantive communication regarding the volume of potentially responsive records on August 20, 2025, Plaintiffs have worked in good faith to narrow that

universe to high-priority documents that are in fact responsive to Plaintiffs' Requests and that can be processed within a reasonable time. Through successive meet-and-confers to refine State's searches and ultimately through significant concessions on their end, Plaintiffs have eliminated entire Requests, narrowed others by date range and search terms, and agreed to limit processing to approximately 10,500 pages, all while operating with incomplete information about State's systems and the accuracy of its search results.

### A. Plaintiffs Have Worked In Good Faith With State to Narrow the Production.

After State provided its initial search results on August 20, 2025, Plaintiffs—concerned by the unexpectedly large number of potentially responsive records identified by State—requested on the same day to schedule a meet and confer with State to discuss. *See* Webb Dec. Ex. B at 134. Plaintiffs also sought to understand State's searches so they could take on the work of identifying avenues for narrowing the searches, which would alleviate the burden on State. To that end, on September 17, 2025, Plaintiffs provided State a detailed list of questions directed at the records searched, the search terms used, the number of hits, and the Requests State sought to narrow. *See* Webb Dec. Ex. C.

That process was interrupted by the longest federal government shutdown in history, which ran from October 1, 2025, to November 12, 2025. Plaintiffs resumed their efforts as soon as the shutdown ended. *See* Webb Dec. Ex. B at 126. Once communication with State resumed, Plaintiffs worked with the Department to find solutions for every Request that State identified as potentially burdensome. *See id.* at 109–110; *id.* Ex. E. Throughout that process, Plaintiffs continued to refine the Requests through revised search terms and eliminating search results as new information emerged. *See* Webb Dec. Ex. B at 1–8, 12–16, 20, 23–27, 33–38, 42–43, 55, 57–59, 62–65, 74–76, 79–82, 85–92, 101–104, 107–108; *id.* Ex. C; *id.* Exs. E–J.

This process has required Plaintiffs to rely on information only State could provide: how State searched, how many records and pages each search yielded, whether results were de-duplicated, and how quickly they could be processed. Unable to independently assess which Requests imposed the greatest burden, Plaintiffs relied on State's representations and tailored their proposals to the numbers State provided. *See id.*

That reliance has been complicated by the evolving nature of State's communications about its search results. State's initial August 20, 2025, results identified more than two million potentially responsive records. *See* Webb Dec. Ex. A at 134–38. That number was based on search parameters State selected unilaterally, without input from Plaintiffs regarding the search terms or records searched. But the vast majority of those records should never have been included in State's initial results. An abbreviation State used for a biometric program coincided with an unrelated abbreviation common in State's records, sweeping in more than two million unrelated documents. *See* Webb Dec. ¶ 13. State provided updated results based on the elimination of the search term in January 2026, but Plaintiffs did not learn how State eliminated these results until April 9, 2026. See *id.*; *id.* Ex. B at 85–87; *id.* Ex. E. To State's credit, it identified and corrected the issue, and the Parties thereafter worked from the corrected figures. *See* Webb Dec. ¶ 13, *id.* Ex. B at 85–87; *id.* Ex. E.

Plaintiffs continued to struggle from a lack of visibility into important aspects of the narrowing process. Until April 24, 2026, State provided Plaintiffs with total record counts, but no *page* counts. *See* Webb Dec. Ex. B at 27. State, however, could estimate the time to process the Requests only by using processing rates calculated by page counts, not record counts. Although Plaintiffs asked about de-duplicated record numbers on September 17, 2025, the records State provided initially were not de-duplicated until April 24, 2026, due to limitations in State's system.

*See* Webb Dec. Ex. B at 27; *id.* Ex. E. As a result, Plaintiffs repeatedly narrowed the universe of documents to be produced without reliable visibility into the volume of pages State would actually process or the degree of duplication in the set. Additionally, on April 7, 2026—after the Parties believed they had narrowed to a nonburdensome universe of records—State identified, due to an inadvertent error, more than 10,000 additional potentially responsive records omitted from its prior counts. *See* Webb Dec. Ex. B at 38, 41–42; *id.* Ex. F.

These obstacles all contributed to an iterative and, at times, imperfect process, throughout which Plaintiffs repeatedly recalibrated as State's information changed. When State suggested in February that Plaintiffs also narrow two additional Requests after having identified them as nonproblematic, Plaintiffs did so. *See* Webb Dec. Ex. B at 42, 64–65; *id.* Ex. E. When State corrected its counts upward in April, Plaintiffs promptly met and conferred with State and agreed to a further-reduced universe (including through search terms and limitations on the email recipients/senders and bureaus searched). *See* Webb Dec. ¶ 13; *id.* Ex. B at 33–38; *id.* Ex. F; *id.* Ex. G. And when initial page-count estimates suggested processing would take over a decade at State's standard rate of 300 pages per month, Plaintiffs asked targeted follow-up questions—about de-duplication and outlier files accounting for hundreds or thousands of pages—so they could narrow without arbitrarily discarding high-priority documents. *See* Webb Dec. Ex. B at 26–27.

**B. Plaintiffs Have Made Substantial, Concrete Cuts to the Universe of Documents.**

Despite these obstacles, Plaintiffs' narrowing efforts and concessions have been substantial. Plaintiffs have eliminated six out of ten Requests outright. To the extent possible, Plaintiffs based those cuts on information in their own possession. For instance, Plaintiffs cut four Requests relating to the Safe Mobility Office initiative because it was terminated in January 2025, opting to forgo documents that remained of interest in favor of reaching a reasonable processing

time. *See* Webb Dec. Ex. A; *id.* Ex. B at 1–2, 20, 42, 72–73. Plaintiffs also agreed to confine the universe of documents for three Requests to documents held on State's unclassified system, despite the fact that classified documents likely contain key information. *See* Webb Dec. Ex. B at 20. This latter concession, along with excluding Request 9, nearly halved the relevant universe of documents. *See* Webb Dec. Ex. B at 20.

Plaintiffs did not stop there. At the Parties' most recent meet-and-confer, held on June 22, 2026, Plaintiffs agreed to further limit the universe of records to approximately 10,500 pages (based on State's current search results). *See* Webb Dec. Ex. B at 1–2. Plaintiffs followed up on June 26, 2026, with their specific proposal, which reduced the scope of the document universe to a carefully defined set of records based on the results of State's searches. *See id.* Plaintiffs have prioritized the documents most likely to be central to their purpose: understanding the technical architecture of the biometric data-sharing systems at issue, how the procured capabilities were engineered, configured, and deployed, and the mechanisms by which biometric data is transmitted, accessed, matched, stored, or shared across national borders. This information is essential to Plaintiffs' ability to research and publicize how the biometric data sharing systems used by the federal government are constructed, the processing operations performed, and the mechanisms by which biometric data is transmitted, accessed, matched, stored, or shared across national borders. These insights are critical to protecting human rights both within and outside the U.S. border and are of significant interest to the public, particularly as the federal government's use of biometric technologies continues to increase.[1] The Requests Plaintiffs have retained reflect that core priority,

---

[1] See, e.g., Meg Anderson, NPR, ICE is spending millions of dollars on iris scanners, expanding its arsenal of tech tools (May 27, 2026), https://www.npr.org/2026/05/27/nx-s1-5822429/ice-buys-iris-scanners-tech-tools; Anthony Kimery, Biometric Update, US expands biometric security cooperation abroad (Jan. 27, 2026), https://www.biometricupdate.com/202601/us-expands-biometric-security-cooperation-abroad.

and the significant number of requests that Plaintiffs have drastically limited or abandoned in order to reach this point underscores the good faith of their approach.

## III. THE AGREED-UPON UNIVERSE OF POTENTIALLY RESPONSIVE DOCUMENTS IS NOT UNDULY BURDENSOME.

The Parties have agreed that the scope of the current document universe is reasonable and requested that the Court order State to begin processing documents. As scoped and agreed upon with State, the current document universe is not unduly burdensome.

An agency must honor a reasonably described FOIA request unless the request requires an "unreasonably burdensome search." *AFGE*, 907 F.2d at 209; *see also Goland*, 607 F.2d at 353. As a threshold matter, when an agency invokes the undue-burden doctrine, the burden of proof rests on the agency: it must "provide sufficient explanation as to why such a search would be unreasonably burdensome." *Nation Magazine*, 71 F.3d at 892; *see also Prop. of the People, Inc. v. U.S. Dep't of Justice*, 530 F. Supp. 3d 57, 63 (D.D.C. 2021); *Ayuda v. Federal Trade Commission*, 70 F. Supp. 3d 247, 275 (D.D.C. 2014). The agency can meet this burden "by submitting '[a] reasonably detailed affidavit.'" *Reps. Comm. for Freedom of Press v. FBI*, 877 F.3d 399, 402 (D.C. Cir. 2017) (quoting *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)); *see also People for American Way Foundation v. U.S. Dep't of Justice*, 451 F. Supp. 2d 6, 11–13 (D.D.C. 2006). That affidavit must explain the structure of the agency's records systems, the nature of the search that would be required, and concrete estimates of the time, cost, and resources involved. *See, e.g.*, *Pinson v. U.S. Dep't of Justice*, 80 F. Supp. 3d 211, 217 (D.D.C. 2015) (holding that the Department of Justice's affidavit was insufficient when it failed to include information such as an estimate of the time required to conduct the search, the cost of the search, and the number of files that would have to be manually searched). The agency must provide a

sufficient explanation via affidavit or declaration that the time and expense of a proposed search would be "well beyond what FOIA requires from an agency." *Ayuda*, 70 F. Supp. 3d at 275–76.

Agencies often take multiple years to process records in response to FOIA requests. *See, e.g.*, *Seavey v. Department of Justice*, 266 F. Supp. 3d 241, 246–48 (D.D.C. 2017) (ordering FBI to produce documents at a rate that would complete production three years from the Court's decision); *Judicial Watch, Inc. v. U.S. Department of State*, 2017 WL 3913212, at *1 (D.D.C. 2017) (summarizing production timeline of nearly four years); *McGehee v. DOJ*, 362 F. Supp. 3d 14, 16 (D.D.C. 2019) (resolving FOIA dispute involving years of negotiations, searches, and productions). Courts have accepted production schedules even when an agency's standard processing rate results in extremely lengthy production periods. For example, in *Martinez v. Department of Justice*, the court held that a processing rate of 500 pages per month was reasonable, even though "the FBI estimate[d]" that it would "not complete processing all responsive pages for almost 40 years." No. 16-1506, 2023 WL 9781681, at *1–2 (D.D.C. Sept. 27, 2023). Likewise, in *Freedom Watch v. Bureau of Land Management*, 325 F. Supp. 3d 139, 142 (D.D.C. 2018), this Court upheld the FBI's interim release policy of 500 pages per month despite the fact that processing of plaintiff's FOIA request would take approximately 500 months. Courts often manage any burden concerns by setting page-per-month rates that reflect competing FOIA workloads and other litigation obligations. *See, e.g.*, *Middle E. Forum v. U.S. Dep't of Homeland Sec.*, 297 F. Supp. 3d 183, 185–88 (D.D.C. 2018) (ordering at least 500 pages per month after balancing the Department of Homeland Security's queue and litigation obligations).

State has agreed with Plaintiffs that the current document universe is reasonable. *See* Joint Status Report, ECF No. 36. While State previously raised the alleged burden of Plaintiffs' original Requests (including in its Answer to Plaintiffs' Amended Complaint, *see* ECF No. 14 at 21), the

Department never made the requisite showing to establish such a burden through a reasonably detailed affidavit. *See Reps. Comm. for Freedom of Press*, 877 F.3d at 402; *Pinson*, 80 F. Supp. 3d at 217. State has searched for and identified responsive documents, and engaged with Plaintiffs in scoping the universe. The current document universe is not unduly burdensome.

Plaintiffs do not dispute that a 14-year production timeline would be unreasonable—but have not requested State process documents for 14 years. Pursuant to the Parties' efforts, the Parties have agreed to reduce the universe of documents State will process to approximately 10,500 pages, to be produced at State's standard rate of 300 pages per month. State has identified the potentially responsive documents to a reasonable degree and agreed to process those documents at its standard rate so as to manage its competing workloads for other FOIA requests. Unlike cases where this Court has found FOIA requests unduly burdensome, in this case State has already conducted a search for, and identified, the documents potentially responsive to the requests, and the Parties have agreed upon a universe of documents to process. *Compare with, e.g., AFGE*, 907 F.2d at 209.

Moreover, the documents Plaintiffs seek are necessary to Plaintiffs' purpose for requesting the documents. The current document universe is scoped to produce certain key records on the development, implementation, and operation of specific biometric contracts and programs and how biometric information is shared with foreign governments. Disclosure of these records will allow Plaintiffs to investigate, research, and make public potential human rights and privacy concerns related to those programs.

The Parties also expect that production may be completed sooner than three years, and have agreed to try to complete production within two years, based on Plaintiffs' further narrowing by date of one Request and typical efficiencies gained over the course of processing, including

through the identification of near-duplicate documents, categories of documents exempt from disclosure under the FOIA, and categories of non-responsive documents—all of which would not require State to fully process each potentially responsive page and, as a result, would speed up processing time. *See* Joint Status Report, ECF No. 36.

With the considerably smaller responsive document universe, the estimated processing time in this case is in line with processing times blessed by many other courts in this District. *See, e.g., Seavey*, 266 F. Supp. 3d at 248 (three years); *Republican Nat'l Comm. v. United States Dep't of State*, 2016 WL 9244625, at *1–2 (D.D.C. Sept. 16, 2016) (two years). And in *Colbert v. Fed. Bureau of Investigation*, the court continues to permit an ongoing document production period that has already lasted eight years. 2018 WL 6299966, at *3 (D.D.C. Sept. 3, 2018); *Colbert v. Fed. Bureau of Investigation*, Joint Status Report, ECF No. 96.

## CONCLUSION

For the foregoing reasons, the agreed-upon document universe is reasonably described and not unduly burdensome, and Plaintiffs respectfully request that the Court order production in accordance with the Parties' agreement.

Dated: July 3, 2026

Respectfully submitted,

By: */s/ Kerri Webb*

Kerri Webb (D.D.C. Bar No. 1632192)
Mayer Brown LLP
1999 K Street, NW
Washington, DC 20006
Telephone: (202) 263-3252
Email: kwebb@mayerbrown.com

Arun Rao (*Pro Hac Vice)*
Mayer Brown LLP
1999 K Street, NW
Washington, DC 20006
Telephone: (202) 263-3221
Email: arao@mayerbrown.com

Sophie Mancall-Bitel (*Pro Hac Vice)*
Mayer Brown LLP
333 South Grand Avenue 47th Floor
Los Angeles, CA 90071-1503
Telephone: (213) 229-9500
Email: smancall-bitel@mayerbrown.com

Laura Bingham (*Pro Hac Vice*)
Institute for Law, Innovation & Technology
Temple University, Beasley School of Law
1719 N. Broad Street
Philadelphia, PA 19122
Telephone: (917) 294-4139
Email: laura.bingham@temple.edu

*Counsel for The Institute for Law, Innovation & Technology, Red en Defensa de los Derechos Digitales, and Surveillance Resistance Lab*